15-1676-cr
United States v. Huggins

In the

# United States Court of Appeals

for the Second Circuit

AUGUST TERM 2016

No. 15-1676-cr

UNITED STATES OF AMERICA,
Appellee,

v.

CHARLES HUGGINS, AKA SEALED DEFENDANT 1,
Defendant-Appellant,

CHRISTOPHER BUTCHKO,
Defendant,

ANNE THOMAS,
Defendant.*

ARGUED: SEPTEMBER 28, 2016
DECIDED: DECEMBER 19, 2016

---

* The Clerk of Court is directed to amend the official caption as set forth above.

Before: WINTER and CABRANES, <u>Circuit Judges</u>, and RESTANI, <u>Judge</u>.[†]

---

     This case concerns an appeal from the judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, <u>Judge</u>), convicting Defendant-Appellant-Charles Huggins of wire fraud and conspiracy to commit wire fraud and sentencing him to a term of imprisonment of 120 months.  We conclude that the district court erred in applying sentencing enhancements for receiving gross receipts in excess of $1 million from a financial institution pursuant to United States Sentencing Guidelines ("the Guidelines" or "U.S.S.G.") § 2B1.1(b)(16)(A) and for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3.  In a summary order published contemporaneously with this opinion, we affirm the judgment of conviction and find no error in the loss calculation.  In addition, we decline to address Huggins's limited ineffective assistance of counsel claim raised before us.  Accordingly, the judgment of the district court is **AFFIRMED**, in part, and **VACATED**, in part, and **REMANDED** for resentencing.

---

JONATHAN T. SAVELLA (Marc Fernich, <u>on the brief</u>), Law Office of Marc Fernich, New York, New York, <u>for Defendant-Appellant</u>.

EDWARD IMPERATORE, Assistant United States Attorney (Karl Metzner, Assistant United States Attorney; Preet Bharara,

---

[†] The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

United States Attorney, <u>on the brief</u>),
Southern District of New York, New York,
New York, <u>for Appellee.</u>

RESTANI, <u>Judge</u>:

Defendant-Appellant Charles Huggins ("Huggins") was convicted on May 14, 2015, after a two-week jury trial in the United States District Court for the Southern District of New York (Sidney H. Stein, <u>Judge</u>) for wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349. The district court sentenced him to 120 months in prison, entered an order of forfeiture in the amount of $2.4 million, and ordered restitution in the amount of $2.4 million.

On appeal, Huggins argues that his conviction was improper because the indictment lacked specificity and failed to inform him of the nature and cause of the accusations against him in violation of the Fifth and Sixth Amendments of the United States Constitution. Huggins also argues that the district court incorrectly applied sentencing enhancements based on a loss figure of $8.1 million, gross receipts from a financial institution in excess of $1 million, and abuse of a position of trust. In addition, he brings an ineffective assistance of counsel claim.

In a summary order published contemporaneously with this opinion, we affirm the district court's judgments on the indictment and sentencing enhancement for a loss figure of $8.1 million, and

decline to resolve Huggins's ineffective assistance of counsel claim at this time. For the reasons set forth below, we conclude that the district court erred in applying the two sentencing enhancements for receiving gross receipts in excess of $1 million from a financial institution pursuant to U.S.S.G. § 2B1.1(b)(16)(A) and for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3.

**BACKGROUND**

In the early 2000s, Huggins ran sham oil companies—he promised investors he would use their money to make a profit in West African oil, but in fact simply pocketed the money. (See Trial Tr. 352)[1] Beginning in the mid-to-late 2000s, Huggins began running sham diamond and gold mining companies—JYork Industries Inc. ("JYork") and Urogo Inc. ("Urogo"). (Id. 73, 77, 354, PSR ¶ 8) Huggins informed investors that their investments in JYork would be used to acquire diamonds and gold in Sierra Leone, and that investments in Urogo would be used to acquire the same in Liberia. (Trial Tr. 354, 437) Huggins convinced dozens of investors to invest in these companies, establishing friendships with at least two of the investors. (A:246–48; Trial Tr. 72, 743) In total, Huggins received approximately $2.4 million from investors for JYork and Urogo. (Gov't Br. at Add. 41–42) Including the receipts attributable to the sham oil companies from the early 2000s, Huggins received approximately $8.1 million from investors. (A:235, 246–48) The investors sent this money to JYork and Urogo accounts at Bank of

---

[1] "Trial Tr." can be found at the trial court docket entry ("DE") numbers 283–301. The pagination refers to the original numbering found on the top right hand of the page.

4

America in New York. (Trial Tr. 374–75) Huggins withdrew money from these accounts by ATM, wire transfer, or by having his assistant, Anne Thomas, cash checks. (See id. 387–89, 874–75)

Although Huggins told investors that JYork and Urogo would use their money to acquire diamonds and gold in Sierra Leone and Liberia, Huggins used practically none of the investors' money to do so. (See Trial Tr. 437–39) Instead, Huggins used the money for a wide variety of personal expenses, including rent payment and other personal bills, distributions to family members and friends, meals at expensive restaurants, the purchase of a Mercedes car, and gifts for a young actress. (Trial Tr. 394–95, 417, 437–39, 445) The government filed an indictment against Huggins on March 6, 2013. (Indictment, DE 15) The superseding indictment, filed on September 4, 2014, alleged two counts: wire fraud under 18 U.S.C. § 1343, and conspiracy to commit wire fraud under 18 U.S.C. § 1349. (Superseding Indictment, DE 248)

On May 14, 2015, after a two-week jury trial, Huggins was found guilty on both counts. At sentencing, the district court found Huggins's base offense level to be 7. (Sentencing Tr. 24, DE 358) The government recommended that all of the relevant sentencing enhancements be applied to Huggins. The district court applied these enhancements to calculate the Guidelines range,[2] including: (1) a twenty-level enhancement for a loss figure of $7,000,001 or

---

[2] All references to the Guidelines refer to the 2014 version, as those are the provisions governing Huggins's May 2015 sentence.

greater under U.S.S.G. § 2B1.1(b)(1)(K) (2014); (2) a two-level enhancement for deriving over $1 million in gross receipts from a financial institution as a result of the offense under U.S.S.G. § 2B1.1(b)(16)(A); and (3) a two-level sentencing enhancement based on abuse of a position of public or private trust under U.S.S.G. § 3B1.3. (Id.) The district court concluded the total offense level to be 39, which when combined with Huggins's criminal history category of I, yielded a Guidelines range of 262 to 327 months. (Id. at 28)

The district court determined that the range "is greater than necessary to meet the ends of the criminal justice system" and considered Huggins's age of sixty-nine years old at the time of sentencing. (Id. at 33) Accordingly, it sentenced Huggins to 120 months on each count to run concurrently. (Id. at 27, 33)

## JURISDICTION

The district court had original jurisdiction over this case under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291. Both parties agree that our Court has jurisdiction over this appeal.

## DISCUSSION

### I. Financial Institution Enhancement

We review the district court's application of the enhancement under U.S.S.G. § 2B1.1(b)(16)(A) de novo. See, e.g., United States v.

<u>Conca</u>, 635 F.3d 55, 62 (2d Cir. 2011).[3] U.S.S.G. § 2B1.1(b)(16)(A) provides for a two-level sentencing enhancement if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense[.]" "'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2B1.1 cmt. n.12(B). Huggins argues that withdrawals of money from his companies' Bank of America accounts by ATM, check, and wire transfer did not trigger this enhancement on the grounds that routine withdrawals from a bank account are not "derived" from "a financial institution." (Huggins Br. at 33–34; Huggins Reply Br. at 15) The government contends that the passage of money through a financial institution, even when

---

[3] The government argued at oral argument that "plain error" review should apply because, although Huggins objected to the financial institution enhancement before the district court, he did not raise a specific rationale for the objection. The government did not cite legal authority for this proposition, and, indeed, our precedent is to the contrary. <u>United States v. Sprei</u>, 145 F.3d 528, 533 (2d Cir. 1998) is instructive:

> Rule 51 of the Federal Rules of Criminal Procedure governs objections made to sentencing orders. . . . In interpreting Rule 51, we have emphasized that "[a]n objection is adequate which fairly alerts the court and opposing counsel to the nature of the claim." <u>United States v. Rodriguez-Gonzales</u>, 899 F.2d 177, 180 (2d Cir. 1990). Our precedents demonstrate that to communicate the "nature" of a claim, a party does not have to present precise or detailed legal arguments. <u>See, e.g.</u>, <u>United States v. Shumard</u>, 120 F.3d 339, 340 n.1 (2d Cir. 1997) (finding that the government's request that the district court "consider" a two-level adjustment for defrauding more than one victim was sufficient to preserve argument on appeal that the district court had erred in calculating the number of victims without regard for "relevant conduct" in addition to the actual offense of conviction)[.] (second alteration in original).

Given the facts of this case, the objection adequately conveyed the nature of the issue.

individual investors are the primary source, is enough to trigger this enhancement.[4] (Gov't Br. at 45–46) We disagree.

Our analysis begins with the text of the enhancement. United States v. Young, 811 F.3d 592, 601 (2d Cir. 2016). The financial institution enhancement applies only if the defendant's derivation of gross receipts from a financial institution is "as a result of the offense." When a defendant derives gross receipts from a financial institution at which he has an account, whether by ATM, check, or wire transfer, he does so simply as a result of having sufficient funds

_____

[4] Both parties agree that Bank of America falls within the definition of a "financial institution." Indeed, the definition is broadly defined to capture virtually all regulated entities and could be applied in a wide range of cases:

> [A]ny institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. 'Union or employee pension fund' and 'any health, medical, or hospital insurance association,' primarily include large pension funds that serve many persons (e.g., pension funds of large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons. U.S.S.G. § 2B1.1 app. n.1.

in his account, not "as a result of the offense." In this sense, a financial institution acted as little more than a conduit of funds as opposed to being the victim who lost funds as a result of the fraud. The Guidelines provide no basis to enhance penalties for a defendant who stores his fraudulent proceeds in a financial institution before withdrawing, while allowing a defendant who avoids use of a financial institution to receive a lesser punishment.

Our precedents focus on whether the financial institution suffers some type of loss or liability in providing the requisite funds. Indeed, no case in this Circuit has applied this enhancement where a financial institution did not suffer some type of loss or liability. See, e.g., United States v. Goldstein, 442 F.3d 777, 779–81, 785–86 (2d Cir. 2006) (applying the enhancement for stealing banking and credit card information); United States v. Khedr, 343 F.3d 96, 98–99, 100–02 (2d Cir. 2003) (fraudulently obtaining car loans); United States v. Savin, 349 F.3d 27, 30–39 (2d Cir. 2003) (stealing money from a foreign investment company); United States v. Millar, 79 F.3d 338, 340–42, 345–46 (2d Cir. 1996) (bank robbery).[5]

Focusing on whether the financial institution suffers a loss or incurs liability comes from the enhancement's requirement that the gross receipts be "derived . . . from" a financial institution "as a result of the offense", i.e., that the financial institution must suffer a loss or

---

[5] Prior to 2001, U.S.S.G. § 2F1.1(b)(8)(B) provided a four-level enhancement if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense."

9

liability.  (emphasis added)[6]  By stealing or fraudulently borrowing from a financial institution, the criminal is putting that institution's financial safety and soundness at risk.  The sentencing enhancement thereby penalizes the criminal for this reckless behavior.  That was the theory behind the 1989 Act creating this enhancement.  Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 961, 103 Stat. 183, 501 (1989).  For example, when a defendant fraudulently obtains a mortgage or car loan and fails to pay the money back, the financial institution suffers a loss.  By contrast, when a defendant simply withdraws money he deposited in

---

[6] The only other circuit to consider how to determine whether funds are derived from a financial institution concluded that the enhancement applies when a financial institution "was the source of the $1 million in gross receipts."   United States v. Stinson, 734 F.3d 180, 183–86 (3d Cir. 2013) (finding financial institution not the source of gross receipts of fraud scheme).   In so concluding, the court stated that "[a] financial institution is a source of a defendant's gross receipts if it owns the funds.  Hence, a financial institution is a source of the gross receipts when it exercises dominion and control over the funds and has unrestrained discretion to alienate the funds."  Id.  This articulation of the standard is problematic, however, because normally a financial institution exercises dominion and control over funds deposited in customer accounts. See Shaw v. United States, No. 15–5991, 2016 WL 7182235, at *3 (U.S. Dec. 12, 2016).  For the reasons explained above, we focus on the loss or liability incurred by the financial institution.

The Supreme Court considered a related situation in Shaw, where it concluded that a defendant "defraud[s] a financial institution" under 18 U.S.C. § 1344(1) by stealing money in which a bank has property rights, even if the bank ultimately does not suffer a monetary loss.  Id. at *3 (defendant taking money in another depositor's account). Because the enhancement, unlike the statute in Shaw, only applies when the gross receipts are "derived . . . from" a financial institution "as a result of the offense", control of an account containing the depositor's own ill-gotten gains is insufficient to trigger the enhancement's application.

a bank, the financial institution is not incurring any meaningful new liability nor is the criminal leveraging the financial institution's balance sheet to support criminal activity.

Here, Huggins derived the funds for his fraudulent companies from individual investors, not Bank of America. The bank did not incur a meaningful loss or liability when Huggins withdrew money from his companies' accounts because investors had deposited this money in his companies' accounts. Applying the enhancement to all cases where a defendant merely withdraws money from his own bank account at a financial institution cuts too broadly and is inconsistent with the primary purpose of the enhancement, i.e., to penalize an individual for placing a financial institution at risk by borrowing or stealing funds to support criminal activity.

Accordingly, we conclude that Huggins did not derive more than $1,000,000 in gross receipts from a financial institution as a result of his offense within the meaning of § 2B1.1(b)(16)(A).

## II.   Abuse of Private Trust Enhancement

Whether Huggins occupied and abused a position of private trust is a legal question that we review de novo. United States v. Jolly, 102 F.3d 46, 48 (2d Cir. 1996).[7] Huggins argues the district court improperly applied a two-level sentencing enhancement based on

---

[7] At oral argument, the government requested the court to review the district court's application of this enhancement for clear error. However, Huggins is not arguing that the district court applied the enhancement based on erroneous facts, but that the facts are legally insufficient to constitute a position of private trust. ( See Huggins Br. at 34–36) Thus, we apply de novo review.

abuse of a position of private trust under U.S.S.G. § 3B1.3. (Huggins Br. at 34–36) He argues that he did not occupy a position of trust, that he was simply a salesman who had no discretionary authority over the victims' financial assets and who engaged in typical commercial transactions. (Id.) The government contends that Huggins occupied a position of private trust because he personally solicited funds from investors and held himself out as the companies' leader with discretion over the use of funds. (Gov't Br. at 39–43; Gov't July 7, 2016 28(j) Letter, ECF No. 86-1) Upon review of the record, we conclude that Huggins did not occupy a position of trust within the meaning of U.S.S.G. § 3B1.3.

U.S.S.G. § 3B1.3 applies a two-level sentencing enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense[.]" The Guidelines Commentary explains that:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection

12

of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3 cmt. n.3.  Under United States v. Thorn, this abuse of trust enhancement involves a two-prong analysis: (1) whether the defendant occupied a position of trust from the victim's perspective and (2) whether that abuse of trust "significantly facilitated the commission or concealment of the offense."  446 F.3d 378, 388 (2d Cir. 2006).  Here, we need not analyze the second prong because Huggins did not occupy a "position of trust."

We have repeatedly held that a "position of trust" is held by one who was accorded discretion by the victim and abused a position of fiduciary or quasi-fiduciary status.  "Whether a position is one of 'trust' within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims[.]"  United States v. Wright, 160 F.3d 905, 910 (2d Cir.1998).  A victim's view of a position as one of trust must, of course, be objectively reasonable.  United States v. Santoro, 302 F.3d 76, 82 (2d Cir. 2002).  A purely arm's-length contractual relationship between the defendant and the victims does not create a position of trust.  See Jolly, 102 F.3d at 48 ("[T]he abuse of trust enhancement applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim.");  Wright, 160 F.3d at 911.  Instead, "an abuse of trust enhancement must involve a fiduciary-like relationship that goes beyond 'simply the reliance of the victim on the misleading statements or conduct of the defendant.'"  United States v. Ntshona,156 F.3d 318, 320 (2d Cir. 1998) (quoting Jolly, 102 F.3d at 49).

13

The government does not direct us to any evidence that Huggins held a fiduciary-like relationship with his victims. Unlike other cases where the defendant served as a financial adviser or had discretionary authority for the victim's financial portfolio, Huggins was merely a salesman for an investment scheme. See United States v. Rivernider, 828 F.3d 91, 114 (2d Cir. 2016) (affirming abuse of trust enhancement where defendant "functioned essentially as an investment advisor for a number of victims"); United States v. Hirsch, 239 F.3d 221, 228 (2d Cir. 2001) (explaining that investment advisors are "entrusted with the discretionary authority to manage the assets of his or her clients" (quoting United States v. Queen, 4 F.3d 925, 929 (10th Cir. 1993))). He contracted at arm's-length with his victims for the sole purpose of soliciting funds for his purported West African mining ventures. (Trial Tr. 51, 196, 202, 315, 377–78, 752, 1176, 1236–37, 1304). In the case of one victim, Huggins even worked with the victim's financial advisor—who had the fiduciary relationship with the client. (Huggins Br. at 11–12). The fact that Huggins was a friend of at least two investors is part and parcel of being a salesman. By itself, personal friendship is not evidence that the victims viewed Huggins as occupying a fiduciary-like position that conferred trust over their financial matters. Santoro, 302 F.3d at 82. The district court relied heavily on the fact that Huggins occupied a managerial role that afforded him the freedom to commit a difficult-to-detect wrong. Although he was the principal organizer of the scheme, it would be double counting for the U.S.S.G. § 3B1.3 enhancement to capture all organizers of fraudulent schemes. Every small-scale fraud led by a single person would qualify for this

14

enhancement because he or she was the principal organizer, irrespective of whether the organizer was acting in a fiduciary-like capacity or held a position of trust.

Our holding in Jolly is precisely on point. In that case, the defendant was president of a company formed to sell computer hardware and software. He raised loans from investors and sent false statements to them, but the company existed only on paper and the money was used to pay for the defendant's personal expenses. Jolly, 102 F.3d at 47–48. The district court applied the private trust enhancement and we reversed on appeal: "[T]he lenders' trust in [the defendant] was simply their reliance on his representations about [his company's] ongoing business and the appearance created by the repayments. Such reliance is the hope of every defendant who engages in fraud." Id. at 49. Huggins's involvement with his investors was no more extensive than Jolly's contact with his customers. Mere reliance on false statements does not qualify for this enhancement.

This case is distinguished from Hirsch, where the defendant "developed 'personal relationships with his clients wherein they relied on and trusted him,'" supporting the conclusion that the defendant occupied a position of trust. 239 F.3d at 228. In Hirsch, however, the defendant acted as an investment advisor on behalf of his victims. Id. at 227. Although a friendship between the defendant and victim may be some evidence that the defendant occupies a position of trust, friendship with victims alone does not trigger the enhancement. Unlike in Hirsch, nothing in the record here suggests

15

that Huggins acted as an investment advisor or broker, that is, an individual who typically "is entrusted with the discretionary authority to manage the assets of his or her clients through the application of specialized knowledge." Hirsch, 239 F.3d at 228 (citation omitted). Huggins simply purported to invest the victims' money in his mining ventures through arm's-length contracts. It would not be accurate to impute such discretionary authority to a mere salesman. See Wright, 160 F.3d at 910 ("[I]n connection with a fraud offense, a defendant who merely procures loans to his company does not hold a position of trust vis-à-vis the lenders.").

If the enhancement were to apply here, the enhancement would apply in virtually all fraud cases where a fraud victim relies on a defendant's false statements. Jolly, 102 F.3d at 49. Such a broad reading would transform this abuse-of-trust enhancement into a vehicle for double counting, relying on a necessary element of the crime as a basis for applying the enhancement. "The trust in short is a specific offense characteristic of fraud, and a Section 3B1.3 enhancement is inappropriate. . . . Such reliance is the hope of every defendant who engages in fraud." Id. Although Huggins breached his victims' trust by using their money for personal gain, he did not occupy a position of trust within the meaning of § 3B1.3.

## CONCLUSION

The financial institution and abuse of trust sentencing enhancements under U.S.S.G. §§ 2B1.1(b)(16)(A) and 3B1.3 were intended as additional penalties for particularly reckless behavior.

16

They should not be read so broadly as to apply to every instance in which a fraud offense is committed. Nor should prosecutors recommend the maximum possible sentencing enhancements without reference to the defendant's particular conduct. In particular, prosecutors should acknowledge in their briefs when no caselaw supports their position, as in the financial institution enhancement, or where considerable caselaw weighs against it, as in the abuse of trust enhancement. For the reasons stated above, we hold that the sentencing court erred in applying the sentencing enhancements under U.S.S.G. §§ 2B1.1(b)(16)(A) and 3B1.3 in a manner that was plainly inconsistent with our precedents. We VACATE the district court's sentence and REMAND to the district court for resentencing. Huggins's judgment of conviction and the district court's application of other sentencing enhancements, as discussed in the summary order filed contemporaneously with this opinion, however, are AFFIRMED.